IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| GREAT SOCIALIST PEOPLE'S ) <br> LIBYAN ARAB JAMAHIRIYA, et al. ) <br> ) <br>     Plaintiffs/Counter-Defendants, ) <br> ) <br> vs. ) <br> ) <br> AHMAD MISKI ) <br> ) <br>     Defendant/Counter-Plaintiff. ) | Case Number: 06-CV-2046 (RBW) |

### AMBASSADOR AUJALI'S MOTION TO QUASH DEFENDANT MISKI'S NOTICE OF DEPOSITION

### Oral Hearing Requested

Ali Suleiman Aujali, the Great Socialist People's Libyan Arab Jamahiriya's Ambassador to the United States of America, and Plaintiff Great Socialist People's Libyan Arab Jamahiriya and Plaintiff Embassy of the Libyan Arab Jamahiriya [collectively hereinafter "Plaintiff Libyan Government"], by and through their attorneys, J.P. Szymkowicz, John T. Szymkowicz and the Law Firm of Szymkowicz & Szymkowicz, LLP, respectfully requests that this Honorable Court quash Defendant Miski's notice of deposition pursuant to the Vienna Convention on Diplomatic Relations of April 18, 1961 and award them their costs incurred in prosecuting this motion, and in support thereof, states:

### General Background

1.  The official name of what is commonly known as "Libya," is the Great Socialist People's Libyan Arab Jamahiriya.

2.  Ali Suleiman Aujali is the Great Socialist People's Libyan Arab Jamahiriya's Ambassador to the United States of America and is stationed at the Libyan Embassy in Washington, DC.

3.  Defendant Miski has served a Notice of Deposition on Plaintiff Libyan Government seeking to take the deposition testimony of Ambassador Aujali on March 13, 2009.

**Background on the Vienna Convention**

4.      The Vienna Convention on Diplomatic Relations of April 18, 1961 [hereinafter "the Vienna Convention"] provides Ambassador Aujali with immunity from providing testimony or producing documents or other tangible items in court.  See http://untreaty.un.org/ilc/texts/instruments/english/conventions/9_1_1961.pdf (accessed on March 11, 2009).

5.      The Libyan Government ratified the Vienna Convention on June 7, 1977.  See http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&id=188&chapter=3&lang=en (accessed on March 11, 2009).

6.      The United States of America ratified the Vienna Convention on November 13, 1972. Id.

**Argument**

**I.     AMBASSADOR AUJALI'S MOTION TO QUASH DEFENDANT MISKI'S NOTICE OF DEPOSITION MUST BE GRANTED PURSUANT TO THE VIENNA CONVENTION.**

Ambassador Aujali's Motion to Quash Defendant Miski's notice of deposition must be granted pursuant to the Vienna Convention on Diplomatic Relations of April 18, 1961. Ambassador Aujali is the "Head of the Mission" as defined in Article 1.  His "person" "shall be inviolable" and "not be liable to any form of arrest or detention" pursuant to Article 29.  He "is not obliged to give evidence as a witness" pursuant to Article 31.  In addition, Ambassador Aujali enjoys immunity from all civil matters pursuant to Article 31.  Ambassador Aujali's "papers," "correspondence" and "property" are inviolable pursuant to Article 30.  Thus, Ambassador Aujali's Motion to Quash Defendant Miski's notice of deposition must be granted pursuant to the Vienna Convention.

> **A.    The purposes of extending diplomatic immunity to ambassadors, such as Ambassador Aujali, are to "contribute to the development of friendly relations among nations" and "to ensure the efficient performance of the functions of diplomatic missions."**

The purposes of extending diplomatic immunity to ambassadors, such as Ambassador Aujali, are to "contribute to the development of friendly relations among

nations" and "to ensure the efficient performance of the functions of diplomatic missions." Hellenic Lines, Limited v. Moore, 345 F.2d 978 (D.C. Cir. 1965) citing the Vienna Convention on Diplomatic Relations of April 18, 1961.  In Hellenic Lines, the court was faced with a U.S. Marshal who refused to serve the Tunisian Ambassador to the United States with a summons in an admiralty case. Id. at 979.  Prior to deciding whether the Tunisian Ambassador had immunity for service of process, the court sought the opinion of the U.S. State Department, which informed the court that "service would prejudice the United States foreign relations and would probably impair the performance of diplomatic functions."  Id. In responding to the court's inquiry, the State Department said

> It is quite probable that such impairment would be caused; the degree of it would depend on the circumstances.  An ambassador and his government would in all likelihood consider that he had been hampered in the performance of his duties if, for example, (a) the ambassador felt obliged to restrict his movements to avoid finding himself in the presence of a process server; or (b) he were diverted from the performance of his foreign relations functions by the need to devote time and attention to ascertaining the legal consequences, if any, of service of process having been made, and to taking such action as might be required in the circumstances; or (c) the manner of service had been publicly embarrassing to him and called attention to the infringement of his personal inviolability. Id. at 981.

Moreover, the State Department said

> The maintenance of friendly foreign relations between the United States and the sending state concerned would certainly be prejudiced by service of process on an ambassador against his will.  The sending state might well protest to the Department that the United States had failed to protect the person and dignity of its official representative, and might complain particularly that service was by an officer of the United States Government, namely, a United States Marshal. Other governments might interpret the incident as meaning that the Government of the United States had decided, as a matter of policy, to depart from what they had considered a universally accepted rule of international law and practice.  Id.

In Hellenic Lines, the court found that

> Serious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary.  When articulating principles of international law in its relations with other states, the Executive Branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns.  Id.

3

Therefore, the Hellenic Lines court found that "the purposes of diplomatic immunity forbid service in this case" and thus, "the Ambassador is not subject to service of process." Id. at 980-81.

> **B. The Vienna Convention has a "broad interpretation of inviolability" and supports the notion that "United States and the United Nations recognize extensive immunity and independence for diplomats, consulates and missions abroad."**

In 767 Third Avenue Associates v. Permanent Mission of the Republic of Zaire to the United Nations, 988 F.2d 295, 303 (2nd Cir. 1993), the court reversed a district court order that granted the landlord possession of the premises leased the Government of Zaire and that ordered the U.S Marshal to forcibly seize the premises, if necessary. The court found that the Vienna Convention has a "broad interpretation of inviolability" and supports the notion that "United States and the United Nations recognize extensive immunity and independence for diplomats, consulates and missions abroad." Id. at 298. The court further found that history supports concept of inviolability expressed in the Vienna Convention:

> Among the laws of nations is the notion that ambassadors must be received and that they must suffer no harm. Beginning 1000 years ago when merchants went to foreign lands seeking trade, they sought to have their disputes settled by judges of their choice administering their own national laws. In 1060, for example, Venice was granted the right to send magistrates to Constantinople to try Venetians charged in civil and criminal cases. A similar process occurred in the western part of the Mediterranean basin where special magistrates called 'consul judges' were appointed to settle disputes between foreign traders and local merchants. Because of the growth of international trade the use of consuls spread. By 1251 Genoa had a consul in Seville and in 1402 there were consuls of the Italian republics in London and the Netherlands. Before the end of the fifteenth century England had consuls in Italy and Scandinavia. In the 16th and 17th centuries individual states took over from traders the task of sending consuls, and the function of the consul was dramatically altered. Judicial duties were eliminated and replaced by the diplomatic functions of looking after the state's interests in trade, industry and shipping. As official state representatives, consuls enjoyed corresponding privileges and immunities. By the 18th century all the major trading states had exchanged consuls. The United States set up its first consulate in France in 1780. Because of the extraordinary growth of consulates during the 19th century, attempts to codify the rules of international law on that subject began in the 20th century. A forerunner of these attempts was the Congress of Vienna in 1815. In 1927 the Inter-American Commission of Jurists prepared a draft of 26 articles on consuls, which served as the basis for the Convention

regarding Consular Agents signed at Havana, Cuba on February 28, 1928. In 1932 Harvard Law School prepared drafts of conventions for the codification of international law on diplomatic privileges and immunities. The International Law Commission added the subject 'consular intercourse and immunities' to those selected for codification at the first session of the United Nations Secretariat in 1949, which the General Assembly approved, and began by the usual appointment of a Special Rapporteur on this question. The study continued from 1956 to 1959 and his commentary provided the foundation work leading to the 1961 Vienna Convention at which 81 nations participated. Id. at 299-300 (citations omitted).

The <u>767 Third Avenue Associates</u> court further noted that:

> Although diplomatic privilege and mission inviolability arose under various now-outdated theories, including Grotius' notion of the 'sacredness of Ambassadors' and the conception of the diplomat as personifying the foreign state's sovereign, modern international law has adopted diplomatic immunity under a theory of functional necessity. Under that doctrine, the United States recognizes the privileges of foreign diplomats in the U.S. with the understanding that American diplomats abroad will be afforded the same protections from intrusions by the host state. The most secure way to guarantee this protection, the United States tells us, is through blanket immunities and privileges without exception. The risk in creating an exception to mission inviolability in this country is of course that American missions abroad would be exposed to incursions that are legal under a foreign state's law. Foreign law might be vastly different from our own, and might provide few, if any, substantive or procedural protections for American diplomatic personnel. Were the United States to adopt exceptions to the inviolability of foreign missions here, it would be stripped of its most powerful defense, that is, that international law precludes the nonconsensual entry of its missions abroad. Another related consideration is the frequent existence of a small band of American nationals residing in foreign countries, often business personnel. Recent history is unfortunately replete with examples demonstrating how fragile is the security for American diplomats and personnel in foreign countries; their safety is a matter of real and continuing concern. Potential exposure of American diplomats to harm while serving abroad and to American nationals living abroad is not 'pure conjecture,' as plaintiffs blithely assert. Id. at 300-01 (citations omitted).
> Additionally, the <u>767 Third Avenue Associates</u> court observed
> The United States has consistently respected the complete inviolability of missions and consulates. Even in extreme cases U.S. authorities will not enter protected premises without permission following, for example, bomb threats. Nor have local authorities been permitted to enter to conduct health and building safety inspections without the consent of the mission involved. An affidavit from the counselor for Host Country Affairs for the United States Mission to the United Nations attests that after the Soviet mission to the U.N. was bombed in 1979, the FBI and local police officers were all refused entry to the mission until the Soviets consented to allow certain law enforcement officers to enter. Absent such consent, the United States tells us, government officials would not have attempted to enter the Soviet mission's premises. Id. at 301 (citations omitted).

Finally, the 767 Third Avenue Associates court responded to claims that diplomatic immunity is abused in rare cases by stating that "[n]otwithstanding popular and ill-informed views to the contrary, the inviolability of premises is not lost by the perpetration from them of unlawful acts. Reforming the Vienna Convention may well be a valid objective. But federal courts are an inappropriate forum to accomplish the amendment of a multilateral treaty to which the United States is a party." Id. at 302.

### C. Personal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized.

In Tachiona v. Mugabe, 386 F. 3d 205, 221 (2nd Cir. 2004), the court found that the principle of diplomatic immunity required the dismissal of a civil case brought against the President and Foreign Minister of Zimbabwe. In Mugabe, the court found that "[p]ersonal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized. It is essential to ensure inviolability of the person of the ambassador in order to allow him to perform his functions without hindrance from the government of the receiving state, its officials and even private persons." Id. at 223.

### D. Even diplomats transiting through a third country from their home country en route to a country where they will serve as a diplomat have immunity.

In Bergman v. Desieyes, 71 F. Supp 334, 334-35 (S.D. N.Y. 1946), the defendant was the French minister to Bolivia, who was served with a summons and complaint in a civil matter in the Southern District of New York while he was "temporarily present in the City en route from France to his post in Bolivia and while he was awaiting transportation to his post." Thus, the question in Desieves was whether a diplomatic minister en route to his post in the country to which he is accredited is immune from service of civil process in a third country through which he is passing on the way to his post." Id. at 334. The Desieves court found that "an ambassador is exempt from the jurisdiction of the Courts of the country in which he resides as ambassador." Id. at 335. In addition, the court observed

6

that "If an envoy travels through the territory of a third state incognito or for his pleasure only, there is no doubt that he cannot claim any special privileges whatever. He is in exactly the same position as any other foreign individual there, although by courtesy he might be treated with particular attention. But matters are different when an envoy, on his way from his own state to the state of his destination, travels through the territory of a third state. Now, as the institution of legation is necessary for the intercourse of States, and is firmly established by International Law, there ought to be no doubt that such third State must grant the right of innocent passage (*jus transitus innoxii*) to the envoy, provided that it is not at war with the sending or the receiving state." Id. at 339.  Thus, "the privilege of an ambassador extended to immunity against all civil suits sought to be instituted against him in the courts of the country to which he was accredited, as well as in those in a friendly country through which he was passing on his way to the scene of his diplomatic labors, and to this privilege the learned court held that he was entitled, as representative of his sovereign, and also because it was necessary for his free and unimpeded exercise of his diplomatic duties." Id. at 338.

### E. Since Ambassador Aujali possesses complete and absolute diplomatic immunity from the jurisdiction of this Honorable Court, the Libyan Government's motion to quash Defendant Miski's notice of deposition must be granted.

Since Ambassador Aujali is accredited by the U.S. State Department as the Ambassador from Libya to the United States of America, he possesses complete and absolute diplomatic immunity from the jurisdiction of this Honorable Court. Ambassador Aujali is the "Head of the Mission" of the Libyan Embassy as defined in Article 1 of the Vienna Convention.  His "person" "shall be inviolable" and "not be liable to any form of arrest or detention" pursuant to Article 29 of the Vienna Convention.  He "is not obliged to give evidence as a witness" pursuant to Article 31 of the Vienna Convention.  In addition, Ambassador Aujali enjoys immunity from all civil matters pursuant to Article 31 of the Vienna Convention.  Ambassador Aujali's "papers," "correspondence" and "property" are inviolable pursuant to Article 30 of the Vienna Convention.

Since this Honorable Court has no jurisdiction over Ambassador Aujali, Defendant Miski's notice of deposition served upon the Libyan Government with regard to Ambassador Aujali must be quashed.

Respectfully submitted,

/x/_____
J.P. Szymkowicz (#462146)
John T. Szymkowicz (#946079)
SZYMKOWICZ & SZYMKOWICZ, LLP
1220 19th Street, N.W., Suite 400
Washington, DC  20036-2438
(202) 862-8500 (voice)
(202) 862-9825 (fax)

Attorney for Ambassador Ali Aujali, Great Socialist People's Libyan Arab Jamahiriya and Embassy of the Libyan Arab Jamahiriya

### Local Rule 7 (m) Certification

I hereby certify that in accord with the Local Rule 7 (m), on February 3, 2009, I personally met with Defendant Miski's counsel, Kamal Nawash, Esquire, after the Court's Scheduling Conference. The purpose of this meeting was to discuss whether Defendant Miski would refrain from following through on his informal request to take Ambassador Aujali's deposition.  The parties agreed to disagree and that Defendant Miski would serve a notice of deposition on the Libyan Government with regard to Ambassador Aujali's presence at this deposition and then the Libyan Government would file a motion to quash. Thus, the parties have not been able to resolve the issue presented in this motion despite good faith efforts on both sides.

/s/_____
J.P. Szymkowicz (#462146)

### Oral Hearing Request

Ambassador Ali Suleiman Aujali, Plaintiff Great Socialist People's Libyan Arab Jamahiriya and Plaintiff Embassy of the Libyan Arab Jamahiriya respectfully requests that an oral hearing on the instant motion be scheduled pursuant to Local Civil Rule 7 (f).

/s/_____
J.P. Szymkowicz (#462146)

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| GREAT SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al. ) ) ) Plaintiffs, ) ) vs. ) AHMAD MISKI ) ) Defendant. ) | Case Number: 06-CV-2046 (RBW) |

**ORDER GRANTING AMBASSADOR AUJALI'S MOTION TO QUASH DEFENDANT MISKI'S NOTICE OF DEPOSITION**

Upon consideration of Ambassador Ali Suleiman Aujali, Plaintiff Great Socialist People's Libyan Arab Jamahiriya and Plaintiff Embassy of the Libyan Arab Jamahiriya's motion to quash Defendant Miski's notice of deposition of Ambassador Aujali, and any response thereto, IT IS HEREBY ORDERED THAT the motion to quash is GRANTED.

_____  _____
Date                                                                Reggie B. Walton
                                                                              United States District Judge

cc:

| | |
|---|---|
| J.P. Szymkowicz (#462146) SZYMKOWICZ & SZYMKOWICZ, LLP 1220 19th Street, N.W., Suite 400 Washington, DC 20036-2438 (202) 862-8500 (voice) (202) 862-9825 (fax) Attorney for Ambassador Aujali, Plaintiff Great Socialist People's Libyan Arab Jamahiriya and Plaintiff Embassy of the Libyan Arab Jamahiriya | Kamal M. Nawash (#458755) THE NAWASH LAW OFFICE 1050 17th Street, N.W., Suite 1000 Washington, DC 20036 (202) 776-7191 (voice) (202) 728-1196 (fax) Attorney for Ahmad Miski |

9