UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
LIBYA and EMBASSY OF LIBYA,            )
                                                    )
             Plaintiffs,                          )
                                                    )
             v.                                   )            Civil Action No. 06-2046 (RBW)
                                                    )
AHMAD MISKI,                              )
                                                    )
             Defendant.                          )
_____)

## MEMORANDUM OPINION

The plaintiffs, Libya and the Embassy of Libya,[1] initiated this action against the

defendant, Ahmad Miski, for allegedly infringing their trademark rights under two provisions of

the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), (B) (2006), and the AntiCybersquatting Consumer

Protection Act, 15 U.S.C. § 1125(d) (2006).  The defendant responded by asserting a

counterclaim for monetary damages arising from the plaintiffs' purportedly tortious interference

with his contracts and business advantage.  The parties tried their claims to the Court on

February 16 and 17, 2011.  At the conclusion of the bench trial, the Court ordered that the parties

submit post-trial briefs, but, in March 2011, prior to the submission of these filings, the plaintiffs

moved to stay the case in light of the then-growing political instability in Libya.  The Court

granted the request for a stay in April 2011, after concluding, for among other reasons, that an

Executive Order preventing the transfer of property or funds to or from the Libyan Government

rendered it unable to proceed on the parties' claims.  See Order at 2-3, Libya v. Miski, Civil Case

---

[1]       The plaintiffs instituted this suit in November 2006, as The Great Socialist People's Libyan Arab
Jamahiriya and the Embassy of the Libyan Arab Jamahiriya.  After political unrest resulted in the overthrow of the
government of Muammar Gaddafi, however, the plaintiffs filed a motion pursuant to Federal Rule of Civil
Procedure 25(c) to amend their complaint to reflect their new names.  The defendant did not oppose the motion, and,
on March 14, 2012, the Court orally granted the motion as conceded.

No. 06-2046 (RBW) (D.D.C. April 14, 2011) ("[R]egardless of whether this Court found in favor

of the plaintiff or the defendant, the Court could not grant the requested relief due to the express

prohibition on the transfer of funds or property to or from the Libyan Government as proscribed

by Executive Order No. 13,566.").  At a status hearing on October 20, 2011, during which the

parties made representations regarding the improvement of the political situation in Libya, the

Court lifted the stay and reissued a briefing schedule for the filing of post-trial briefs.  After

receiving and reviewing the briefs, which included the parties' proposed findings of fact,[2] the

Court heard the parties' closing arguments on March 16, 2012.  Based on the parties' arguments

presented during the February 2011 bench trial, the facts about which the Court may take judicial

notice, the closing arguments presented to the Court on March 16, 2012, and the parties' post-

trial briefs, the Court makes the following findings of fact that provide the basis for its

conclusions of law.

## I. FINDINGS OF FACT

A.  The parties to this action and the services provided by each

1. There are two plaintiffs in this case.  The first is the sovereign state of Libya.  The

second, the Embassy of Libya, is a diplomatic agent and instrumentality of the first.

2. The Embassy plaintiff is accredited and officially known by the United States

Department of State as the Libyan Embassy (formerly the Embassy of the Libyan Arab

Jamahiriya).  The Embassy was sometimes referred to as a "People's Bureau," but this was

merely an alternative name and not an officially recognized designation.

---

[2]        See generally Plaintiff Libyan Government's Post-Trial Brief ("Pls.' Br."); Post-Trial Memorandum of Defendant/Counter-Plaintiff Ahmad Miski ("Def.'s Br."); and Plaintiff Libyan Government's Opposition to Defendant Miski's Post-Trial Memorandum ("Pls.' Opp'n").

3. The domain name[3] used by the Embassy during much of the pendency of this case was www.libyanbureau.com.  Now, however, the Embassy appears to employ the domain name www.libyausaembassy.com.

4. The Libyan government requires that all commercial and legal documents be "legalized," to verify their authenticity and validity to those receiving the documents.

5. There are several steps that comprise this document-legalization process.  The proponent of the document must first complete the document.  The document must then be notarized and authenticated by the United States Department of State.  It is then certified by the National United States Arab Chamber of Commerce or a like body.  Finally, the Libyan Embassy legalizes the document by placing a stamp on it.

6. The Embassy charges fees in connection with its legalization of documents.

7. The defendant is what is known as an "expeditor" of documents.  The defendant, through his Arab-American Chamber of Commerce, facilitates the legalization of documents. He does not actually legalize the documents himself, as legalization is provided solely by the Embassy.  Rather, the defendant's activity involves the certification step of the legalization process.

8. The Embassy does not provide certification services.

9. The defendant does not provide legalization services.

B.  The domain names at issue

10. Defendant Miski, the record owner of the domain names at issue, purchased the websites in 2002 and 2003.[4]

---

[3]       A domain name is the unique identifier of a certain website on the internet.  See Meriam-Webster Online Dictionary, available at http://www.merriam-webster.com/dictionary/domain%20name.

11. Defendant Miski registered the domain names at issue to increase the internet search rankings for his own Arab-American Chamber of Commerce website: www.arabchamber.com. All of the domain names at issue redirect users typing the disputed domain names to Defendant Miski's own Arab-American Chamber of Commerce website.

C.  United States-Libya Relations

12. The United States established diplomatic relations with Libya in approximately 1952 or 1953.

13. In 1981, the United States government closed the Libyan government's diplomatic offices in Washington, D.C., and expelled the Libyan staff in response to a general pattern of conduct contrary to internationally accepted standards of diplomatic behavior.

14. From 1986 to 2004, bilateral relations between the United States and Libya were frozen when the United States imposed broad economic sanctions against Libya.  Specifically, President Ronald Reagan, exercising his powers under the International Emergency Economic Powers Act and the National Emergencies Act, issued Executive Orders 12,543 and 12,544 on January 7, 1986, and January 8, 1986, respectively.  These Executive Orders prohibited commercial trade and certain other transactions with Libya and persons associated with the Libyan government, and "blocked" Libyan government property located in the United States or possessed by United States persons.[5]

---

[4]      The domain names registered by the defendant are: "embassyoflibya.org," "libyaembassy.com," "libyaembassy.org," and "libyanembassy.com."

[5]      In full, Executive Order 12, 543 provided:

I, Ronald Reagan, President of the United States of America, find that the policies and actions of the Government of Libya constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and hereby declare a national emergency to deal with that threat.

(continued . . . )

I hereby order:

Section 1. The following are prohibited, except to the extent provided in regulations which may hereafter be issued pursuant to this Order:

(a) The import into the United States of any goods or services of Libyan origin, other than publications and materials imported for news publications or news broadcast dissemination;

(b) The export to Libya of any goods, technology (including technical data or other information) or services from the United States, except publications and donations of articles intended to relieve human suffering, such as food, clothing, medicine and medical supplies intended strictly for medical purposes;

(c) Any transaction by a United States person relating to transportation to or from Libya; the provision of transportation to or from the United States by any Libyan person or any vessel or aircraft of Libyan registration; or the sale in the United States by any person holding authority under the Federal Aviation Act of any transportation by air which includes any stop in Libya;

(d) The purchase by any United States person of goods for export from Libya to any country;

(e) The performance by any United States person of any contract in support of an industrial or other commercial or governmental project in Libya;

(f) The grant or extension of credits or loans by any United States person to the Government of Libya, its instrumentalities and controlled entities;

(g) Any transaction by a United States person relating to travel by any United States citizen or permanent resident alien to Libya, or to activities by any such person within Libya, after the date of this Order, other than transactions necessary to effect such person's departure from Libya, to perform acts permitted until February 1, 1986, by Section 3 of this Order, or travel for journalistic activity by persons regularly employed in such capacity by a newsgathering organization; and

(h) Any transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order.

For purposes of this Order, the term ``United States person'' means any United States citizen, permanent resident alien, juridical person organized under the laws of the United States or any person in the United States.

Sec. 2. In light of the prohibition in Section 1(a) of this Order, section 251 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1881), and section 126 of the Trade Act of 1974, as amended (19 U.S.C. 2136) will have no effect with respect to Libya.

Sec. 3. This Order is effective immediately, except that the prohibitions set forth in Section 1(a), (b), (c), (d) and (e) shall apply as of 12:01 a.m. Eastern Standard Time, February 1, 1986.

Sec. 4. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of this Order. Such actions may include prohibiting or regulating payments or transfers of any property or any transactions involving the transfer of anything of economic value by any United States person to the Government of Libya, its instrumentalities and controlled entities, or to any Libyan national or entity owned or controlled, directly or indirectly, by Libya or Libyan nationals. The Secretary may redelegate any of these functions to other officers and agencies of the Federal government. All agencies of the United States government are directed to take all appropriate measures within their authority to carry out the provisions of this Order, including the suspension or termination of licenses or other authorizations in effect as of the date of this Order.

This Order shall be transmitted to the Congress and published in the Federal Register.

Ronald Reagan
The White House,
January 7, 1986.

Exec. Order No. 12,543, 51 Fed. Reg. 875 (Jan. 7, 1986).  Executive Order 12, 544 states:

By the authority vested in me as President by the Constitution and laws of the United States, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the

(continued . . . )

15. The sanctions were unilaterally imposed by the United States.

16. During the sanctions period, there was no need for document legalization or certification of commercial documents, as most commercial transactions between the United States and Libya were banned by the sanctions. Private documents such as birth certificates or educational transcripts were certified by the Libyan Mission to the United Nations in New York and by the defendant.

17. During the sanctions period, the Libyan government entrusted its building space in Washington, D.C., to the government of the United Arab Emirates.

## II. CONCLUSIONS OF LAW

A trademark owner asserting a claim under the AntiCybersquatting Consumer Protection Act must establish that: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of the owner's mark; and (4) the defendant used, registered,

---

National Emergencies Act (50 U.S.C. 1601 *et seq.*) and section 301 of title 3 of the United States Code, in order to take steps with respect to Libya additional to those set forth in Executive Order No. 12543 of January 7, 1986, to deal with the threat to the national security and foreign policy of the United States referred to in that Order,

I, RONALD REAGAN, President of the United States, <u>hereby order blocked all property and interests in property of the Government of Libya, its agencies, instrumentalities</u> and controlled entities and the Central Bank of Libya that are in the United States, that hereafter come within the United States or that are or hereafter come within the possession or control of U.S. persons, including overseas branches of U.S. persons.

The Secretary of the Treasury, in consultation with the Secretary of State, is authorized to employ all powers granted to me by the International Emergency Economics Power Act, 50 U.S.C. 1701 *et seq.*, to carry out the provisions of this Order.

This Order is effective immediately and shall be transmitted to the Congress and published in the Federal Register.

Ronald Reagan
The White House,
January 8, 1986

Exec. Order No. 12544, 51 Fed. Reg. 1235 (Jan. 8, 1986) (emphasis added).

or trafficked in the domain name (5) with a bad faith intent to profit.  See <u>DaimlerChrysler v.</u>
<u>The Net, Inc.</u>, 388 F.3d 201, 204 (6th Cir. 2004).

A.  <u>Does the Embassy have a Valid Trademark Entitled to Protection?</u>

15 U.S.C. § 1127 defines a trademark "as including 'any word, name, symbol, or device
or combination thereof' used by any person 'to identify and distinguish his or her goods,
including a unique product, from those manufactured or sold by others and to indicate the source
of the goods, even if that source is unknown.'"  <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S.
763, 768 (1992) (quoting 15 U.S.C. § 1127 (2006))).  "Because a nonregistered mark has no
presumption of validity," the burden of proving the mark's classification lies on the party
asserting that the mark is entitled to protection.  <u>A.J. Canfield Co. v. Honickman</u>, 808 F.2d 291,
297 (3d Cir. 1986); <u>accord</u> <u>Blinded Veterans Ass'n v. Blinded Am. Veterans Found.</u>, 872 F.2d
1035, 1041 (D.C. Cir. 1989).  "[I]t is common ground" that unregistered marks may be entitled
to protection, and the "general principles qualifying a mark for registration under § 2 of the
Lanham Act are for the most part applicable in determining whether an unregistered mark is
entitled to protection."  <u>Two Pesos, Inc.</u>, 505 U.S. at 768.

"Marks are often classified in categories of generally increasing distinctiveness; . . . they
may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."  <u>Id.</u> (citing
<u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir.1976)).  "The latter three
categories of marks, because their intrinsic nature serves to identify a particular source of a
product, are deemed inherently distinctive and are entitled to protection."  <u>Id.</u>  "Inherent
distinctiveness is attributable to a mark when the mark 'almost automatically tells a customer
that it refers to a brand and . . . <u>immediately</u> signal[s] a brand or product source.'"  <u>Amazing</u>

Spaces, Inc. v. Metro Mini Storage, 608 F.3d 225, 240 (5th Cir. 2010) (quoting Wal-Mart Stores,

Inc. v. Samara Bros., Inc., 529 U.S. 205, 210 (2000)) (emphasis in orginal)).   On the other hand,

"[m]arks which are merely descriptive of a product are not inherently distinctive," Two Pesos,

505 U.S. at 769, and, rather than immediately conveying a brand or product source,

"immediately convey[] knowledge of a quality, feature, function, or characteristic of the goods or

services with which [they are] used," In re Bayer Aktiengesellschaft, 488 F.3d 960, 963 (Fed.

Cir. 2007) (emphasis omitted).   "When used to describe a product, they do not inherently identify

a particular source, and hence cannot be protected," unless they have acquired "distinctiveness

which will allow them to be protected under the [Lanham] Act."   Two Pesos, Inc., 505 U.S. at

769.   "This acquired distinctiveness is generally called secondary meaning."   Id.   (internal

quotation marks omitted).

   "A descriptive mark describes a product's features, qualities or ingredients, . . . ,or

describes the use to which a product is put."   Genesee Brewing Co. v. Stroh Brewing Co., 124

F.3d 137, 143 (2d Cir. 1997) (internal quotation marks and citations omitted).   In other words,

"[t]o be descriptive, a term need only describe the essence of the business, rather than spell out

comprehensively all its adjunct services."   Security Ctr., Ltd. v. First Nat'l Security Ctrs., 750

F.2d 1295, 1299 (5th Cir. 1985).   "A suggestive mark[, however,] employs terms which do not

describe but merely suggest the features of the product, requiring the purchaser to use

imagination, thought and perception to reach a conclusion as to the nature of the goods."

Genesee Brewing Co., 124 F.3d at 143 (internal quotation marks and citation omitted).   In

considering whether a mark is descriptive or suggestive, then, the appropriate inquiry is "how

much imagination is required on the consumer's part in trying to cull some indication from the

mark about the qualities, characteristics, effect, purpose, or ingredients of the product or

service." Security Ctr., Ltd., 750 F.2d at 1299.

It is undisputed that the marks at issue here are not registered trademarks. See Pls.'s Br.

at 20. Although they agree on the principles that must be applied in determining whether the

Embassy has a valid trademark entitled to protection, see Def.'s Br. at 10, the parties dispute

whether the purported Embassy Marks are descriptive or suggestive, see Pls.' Br. at 33-36;

Def.'s Br. at 11-12. The plaintiffs maintain that they have "rights in the Embassy Marks based

on their actual use in commerce in conjunction with specific services in the United States." Pls.'

Br. at 25. Specifically, the Embassy claims that it "uses the specific Embassy Marks . . . in

conjunction with its document legalization services." Id. at 27. Accordingly, the plaintiffs

contend that because

> [t]he only entity in the world that can 'legalize' documents to be submitted from
> one country to Libya is the Libyan Embassy . . . , the Embassy Marks are
> suggestive as they could only represent the source (the Libyan Embassy) of the
> legalization services and do not describe a characteristic or quality of the
> document legalization services themselves other than the source of the services.

Id. at 33; see also Pls.' Opp'n at 19. Alternatively, the plaintiffs argue that even if the Embassy

Marks are found to be merely descriptive, they "have acquired distinctiveness because of their

continuous use in conjunction with document legalization services in the United States for

decades." Pl.s' Br. at 34. Unsurprisingly, the defendant disagrees, asserting that "[b]oth the

terms 'Libya[n] Embassy' and 'Embassy of [Libya]' are merely descriptive," Def.'s Br. at 11,

and that the plaintiffs have failed to meet their burden of proving secondary meaning, id. at 13.

The Court agrees with the defendant.

As this Circuit and other courts have observed, the categories into which trademarks are placed "'tend to blur at the edges and merge together,'" making them "'somewhat difficult to articulate and to apply.'"  Blinded Veterans Ass'n, 872 F.2d at 1039 (quoting Zatarain's, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 790 (5th Cir. 1983)).  Despite this difficulty, after examining the case law and the parties' arguments, the Court concludes for several reasons that the terms "Libyan Embassy" and "Embassy of Libya" are best classified as descriptive, rather than suggestive, marks.  First, purchasers and members of the general public need not resort to "imagination, thought and perception to reach a conclusion as to the nature of the goods" or services offered by the Embassy.  Genesee Brewing Co., 124 F.3d at 143.  Rather, "the mark, though hardly transparent, does give the unknowing consumer some idea of the function, quality, or components of the [organization's services]."  Security Ctr., Ltd., 750 F.2d at 1299.  Indeed, upon being exposed to the term "Libyan Embassy," the unknowing consumer readily understands that the entity is involved in the provision of consular services to the general public and serves as the diplomatic arm of the Libyan government in the United States.

Second, and similarly, although the plaintiffs argue that the service they provide, and which must be protected by the mark, is the legalization of documents, the Court finds this argument unpersuasive, as the Libyan Embassy serves the public through more avenues than simply the legalization of documents for use in Libya.  See Pls.' Br. at 17 (quoting the testimony of a witness employed by the Libyan Embassy who explained "the specific services that are provided by the Embassy . . . are bilateral diplomatic relations and consular services to the general public").  For example, when one hears the term "Libyan Embassy," products and services such as visas, passports, and other consular requirements readily spring to mind.

Accordingly, it seems a stretch to argue that the mark is suggestive because it does not
specifically describe the legalization of documents.  See Pls.' Opp'n at 19 (contending that the
"the Embassy Marks do not describe a particular characteristic of the Libyan Government's
document legalization services, beyond the sole and single source thereof") (emphasis added).
In other words, the plaintiffs have seemingly attempted to narrow the class of services and
products provided by the Embassy to achieve greater conceptual distance between the mark and
what it represents.

        Third, and finally, the term "Libyan Embassy" also conjures the idea of a physical
space—the base of operations for Libyan diplomats in the United States.  The plaintiffs have
themselves emphasized this point during this litigation.  See, e.g., Pls.' Br. at 12 (asserting that
because the Libyan government maintained its "embassy building" in Washington, D.C., during
the sanctions period, it has "always had an Embassy in the United States"); id. at 13 (explaining
that the building was referred to as the Libyan Embassy and "continued to exist"); Pls.' Opp'n at
26 (defining the term "embassy" as "a building containing the offices of an ambassador and
staff").  Indeed, "[i]t is difficult to imagine another term of reasonable conciseness and clarity by
which the public refers" to the physical space occupied by Libyan diplomats in Washington,
D.C.  Blinded Veterans Ass'n, 872 F.2d at 1041.  It is clear, therefore, that even the plaintiffs do
not view the term "Libyan Embassy" as "immediately signal[ing] a brand or product source,"
Wal-Mart Stores, Inc., 529 U.S. at 210, because it also connotes this physical space.

        A brief review of two often-cited trademark cases confirms the Court's conclusion that
the terms "Libyan Embassy" and "Embassy of Libya" are descriptive, rather than suggestive,
marks.  See Zatarain's, Inc., 698 F.2d at 790-91 (citing both Vision Center v. Opticks, Inc., 596

F.2d 111 (5th Cir. 1979) and <u>Douglas Labs. Corp. v. Copper Tan, Inc.</u>, 210 F.2d 453 (2d Cir.

1954).  In <u>Vision Center v. Opticks, Inc.</u>, the Fifth Circuit concluded that the disputed mark—

"The Vision Center"—was descriptive, rather than suggestive as urged by the partnership using

the mark.  596 F.2d at 116.  The court observed that "[w]henever a word or phrase naturally

directs attention to the qualities, characteristics, effect, or purpose of the product or service, it is

descriptive and cannot be claimed as an exclusive trade name."  <u>Id.</u>  The Fifth Circuit then

concluded that "[i]t simply d[id] not require an effort of the imagination to decide that 'vision

center' is a place where one can get glasses," and found either of the names used by the parties

"to be descriptive of the service provided by a business that deals in optical goods."  <u>Id.</u> at 117.

In <u>Douglas Labs. Corp. v. Copper Tan, Inc.</u>, however, the Second Circuit determined that the

word "Coppertone" was suggestive, rather than descriptive as concluded by the district court.

210 F.2d at 454; <u>see also</u> <u>Zatarain's, Inc.</u>, 698 F.2d at 791 (observing that the "term Coppertone

has been held suggestive in regard to sun tanning products").  After explaining that "[t]he test is

the imaginativeness involved in the suggestion," the Second Circuit reasoned that "[t]he name

[Coppertone] . . . is more properly a 'come-on' to allure the trade, than a mundane description of

the preparation itself or its indirect consequences."  <u>Douglas Labs. Corp.</u>, 210 F.2d at 455-56.

Here, the term "Libyan Embassy" clearly conveys consular services as the term "Vision Center"

conveyed the delivery of optical services and, moreover, does not require the imaginativeness

needed to associate sun tanning products with the term "Coppertone."  Accordingly, the terms

"Libyan Embassy" and "Embassy of Libya" are properly classified as descriptive marks, as they

"simply do[] not require an effort of the imagination to decide that," <u>Vision Center</u>, 596 F.2d at

117, the Libyan Embassy is a place where one can acquire consular services provided by the Libyan government.

Finally, the Court finds a recent case from the Federal Circuit instructive on the descriptive/suggestive divide in instances where the words in the disputed term may not be exactly synonymous with the service or product offered under the mark (e.g., vision and optical). In In re The Chamber of Commerce of the United States, the Federal Circuit affirmed a determination by the Trademark Trial and Appeal Board that the term "National Chamber" was merely descriptive.  675 F.3d 1297, 1298 (Fed. Cir. 2012).  The Chamber of Commerce sought protection for the term "National Chamber" in connection with its offering of the following services: (1) providing online directory information services featuring information regarding local and state chambers of commerce; (2) providing information and news in the field of business, namely information and news on current events and on economic, legislative, and regulatory developments that can impact businesses; (3) administration of a discount program enabling participants to obtain discounts on goods and services; (4) analysis of governmental policy relating to businesses; and (5) business data analysis.  See id. at 1298-99.  The Federal Circuit relied on the reasoning of the Trademark Trial and Appeal Board, explaining that the conclusion of the Board was based on the fact that

> NATIONAL describes services that are nationwide in scope, and CHAMBER is descriptive of the services because it illustrates the purposes of the services—promoting the interests of businessmen and businesswomen, which is a purpose common to chambers of commerce.

Id. at 1299 (internal quotation marks and alteration omitted).  The Federal Circuit concluded that it "need only find that NATIONAL CHAMBER immediately conveys information about one feature or characteristic of at least one of the designated services within each of the" Chamber of

Commerce's trademark applications.  Id. at 1301.  Here, just as the term "National Chamber" immediately conveyed the business services offered by the Chamber of Commerce of the United States, "Libyan Embassy" and "Embassy of Libya" immediately convey the features and characteristics of the consular services offered by the Embassy.  In other words, consular services are a purpose common to embassies; as "National Chamber" is to business services, "Libyan Embassy" is to consular services.  Accordingly, the terms are properly classified as descriptive marks and entitled to protection only if they have acquired secondary meaning in the marketplace.

   i.  Have the Plaintiffs Demonstrated that the term "Libyan Embassy" has Acquired
       Secondary Meaning?

   "The case law uniformly requires [the refusal] of trade name protection to a descriptive term unless it has acquired a secondary meaning."  Vision Center, 596 F.2d at 117-18.  The development of secondary meaning has occurred "when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  Wal-Mart Stores, Inc., 529 U.S. at 211 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)).  "The [secondary meaning] inquiry is one of the public's mental association between the mark and the alleged mark holder."  Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465, 476 (5th Cir. 2008).  While not limited to these categories, courts consider five types of evidence "in ascertaining whether secondary meaning has attached to a mark: (1) survey evidence; (2) the length and manner of use of the name; (3) the nature and extent of advertising and promotion of the name; (4) the volume of sales; and (5) instances of actual confusion."  Security Center, Ltd., 750 F.2d at 1301 (citing Bank of Texas v. Commerce Southwest, Inc., 741 F.2d 785 (5th Cir. 1984)).  And because

14

"'[t]he chief inquiry is the attitude of the consumer,'" Security Center, Ltd., 750 F.2d at 1301

(quoting Aloe Creme Labs., Inc. v. Milsan, Inc., 423 F.2d 845, 849 (5th Cir. 1970)), "'the

authorities are in agreement that survey evidence is the most direct and persuasive way of

establishing secondary meaning,'" Security Center, Ltd., 750 F.2d at 1301 (quoting Zatarain's,

Inc., 698 F.2d at 795)); accord Amazing Spaces, Inc., 608 F.3d at 248 (explaining that "[b]ecause

the primary element of secondary meaning is a mental association in buyers' minds between the

alleged mark and a single source of the product, the determination whether a mark or dress has

acquired secondary meaning is primarily an empirical inquiry" (internal quotation marks,

alteration, and citation omitted)).  Finally, "[p]roof of secondary meaning entails rigorous

evidentiary requirements."  Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F. Supp. 129, 134

(S.D.N.Y. 1972).

     Here, the plaintiffs maintain that "the Embassy Marks have acquired distinctiveness

because of their continuous use in conjunction with document legalization services in the United

States for decades."  Pls.' Br. at 34; see also Pls.' Opp'n at 21 ("The Libyan Government's

Embassy Marks have acquired distinctiveness because of their continuous use in conjunction

with document legalization services in the United States.").  The defendant disagrees, arguing

that the plaintiffs have presented insufficient evidence proving secondary meaning.  See Def.'s

Br. at 14-19.  The Court agrees with the defendant that the plaintiffs have failed to meet the

"rigorous evidentiary requirements," Ralston Purina Co., 341 F. Supp. at 134, attendant to

proving secondary meaning and, furthermore, concludes that the undisputed duration and

purpose of the sanctions period counsels against a finding of secondary meaning.

Despite the fact that a showing of secondary meaning is dependent on the attitudes and perceptions of the public, the plaintiffs have adduced no such evidence.  Rather, at the bench trial, the plaintiffs relied on the testimony of an employee of the Libyan Embassy and her opinions as to the perception of the mark in the marketplace.  See, e.g., Pls.' Br. at 35 (quoting Leila Zubi's testimony on how the public perceives the Embassy's name).  While it is not at all implausible that the general public may understand the term "Libyan Embassy" to be the Libyan government's provider of consular services, the Court cannot make a finding of secondary meaning on the basis of how it imagines the public might construe the term or on how an Embassy employee may believe the public to view the term.  Here, then, not only is there a total absence of survey evidence, the form of evidence that courts have held constitutes the "'most direct and persuasive way of establishing secondary meaning,'" Security Center, Ltd., 750 F.2d at 1301 (quoting Zatarain's, Inc., 698 F.2d at 795)), but the voice of the public is altogether absent.  This evidentiary failure cannot be overlooked by the Court.[6]

Next, the Court concludes that the length and purpose of the severing of diplomatic ties and the imposition of sanctions compels a finding that the plaintiffs have failed to show secondary meaning.  First, although the plaintiffs make much of the fact that the embassy building remained in existence during the sanctions period, see, e.g., Pls.' Br. at 12, this fact is irrelevant as they have attempted to tie the term "Libyan Embassy" to the document legalization services provided, not the mere presence of a building.  In other words, the simple fact that a building existed does little to advance the plaintiffs' claim that "the Embassy Marks have

---

[6]      Nor did the plaintiffs put forth evidence regarding the volume of sales or instances of actual confusion, further buttressing the Court's conclusion that their evidence failed to demonstrate the existence of secondary meaning.  The plaintiffs did provided letterhead, business cards, and website printouts demonstrating their name and, in the case of the website printout only, their offering of legalization services, but this evidence is hardly strong with regard to the nature and extent of advertising or their promotion of their name.

acquired distinctiveness because of their <u>continuous use</u> in conjunction with document legalization services in the United States for <u>decades</u>," Pls.' Br. at 34 (emphases added), because it is undisputed that the services in question were <u>not</u> provided (and, indeed, could not be) during the sanctions period.  The sanctions period thus interrupted the purported continuous use of the alleged marks.  Second, it is indisputable that the United States severed its diplomatic ties with Libya and that the President issued Executive Orders 12,543 and 12,544 as official repudiation of the Libyan government.  It is clear, then, that in addition to their failure to put forth any credible evidence regarding the public's impressions of the names Embassy of Libya and Libyan Embassy, the plaintiffs are also restrained by the restrictions imposed by the President on the "length and manner of use of the name[s]," <u>Security Center, Ltd.</u>, 750 F.2d at 1301.[7]

As merely descriptive marks, for which the plaintiffs have failed to demonstrate the existence of secondary meaning within the marketplace, the terms "Embassy of Libya" and "Libyan Embassy" are not entitled to protection because they would not qualify for registration under the Lanham Act.[8]

B. <u>The Defendant's Counterclaim</u>

"Tort[i]ous interference with contract has four elements in the District of Columbia: '(1) existence of a contract; (2) knowledge of the contract; (3) intentional procurement of breach by the defendant; and (4) damages resulting from the breach.'" <u>Dean v. Walker</u>, __ F. Supp. 2d __, -__, 2012 WL 2335944, *3 (D.D.C. June 19, 2012) (quoting <u>Riggs v. Home Builders Inst.</u>, 203 F.

---

[7]        Although the Court does, in part, base its determination that the marks lack secondary meaning on the imposition of sanctions, the Court takes no position on whether the sanctions could have resulted in a finding of abandonment had the marks been otherwise entitled to protection.  In other words, the Court does not address whether the imposition of economic or diplomatic sanctions by the United States could operate to end common-law protection for a mark held by that sovereign.

[8]        Having concluded that the plaintiffs do not possess valid marks entitled to protection, the Court need not analyze the remaining elements of the AntiCybersquatting  Consumer Protection Act.

Supp. 2d 1, 22 (D.D.C. 2002)); <u>accord</u> <u>Onyeoziri v. Spivok</u>, 44 A.3d 279, 286 (D.C. 2012).

Somewhat similarly,

> the requisite elements to a successful claim of tortious interference with a
> prospective economic advantage are (1) the existence of a valid business
> relationship or expectancy, (2) knowledge of the relationship or expectancy on the
> part of the interferer, (3) intentional interference inducing or causing a breach or
> termination of the relationship or expectancy, and (4) resultant damage.

<u>Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.</u>, 791 F. Supp. 2d 33, 55 (D.D.C. 2011)

(internal quotation marks and citation omitted).

Here, the defendant's counterclaim asserts one count of tortious interference with

contract, and one count of tortious interference with prospective economic advantage.  Both are

easily disposed of due to the defendant's failure to put forth evidence regarding any of the

requisite elements.  The only testimony provided by the defendant was that he worked with one

corporation in 2004 and submitted three documents to the Libyan Embassy on the corporation's

behalf.  <u>See</u> Feb. 17, 2011 Hearing Transcript at 314:16-315:12; <u>id.</u> at 317:9-24.   Indeed, the

defendant himself admitted that the Libyan Embassy had not contacted his clients, <u>id.</u> at 317:6-8,

which conflicts with a finding of intentional interference.  <u>See</u> <u>Bennett Enters., Inc. v. Domino's

Pizza, Inc.</u>, 45 F.3d 493, 499 ("As its name would suggest, <u>intentional</u> interference requires an

element of intent.  Further, 'a general intent to interfere or knowledge that conduct will injure the

[claimant's] business dealings is insufficient to impose liability.'  [Claimant] cannot establish

liability without a 'strong showing of intent to disrupt ongoing business relationships.' (quoting

<u>Genetic Sys. Corp. v. Abbott Labs.</u>, 691 F. Supp. 407, 423 (D.D.C. 1988) (emphasis in

original)).  Accordingly, the defendant having failed to put forth evidence of a prima facie case

of tortious interference with a contract or tortious interference with a prospective economic advantage, the Court finds in favor of the plaintiffs and rejects the defendant's counterclaim.

### III. CONCLUSION

Because the plaintiffs have failed to show that they have valid marks entitled to protection, they cannot prevail on their claims under either the Lanham Act or the AntiCybersquatting Conusumer Protection Act.  And because the defendant has failed to meet his evidentiary burdens with regard to his counterclaim, he cannot prevail on either his claim of tortious interference with contract or his claim of tortious interference with prospective economic advantage.  Accordingly, the Court finds in favor of the defendant on the plaintiffs' claims, and in favor of the plaintiffs on the defendant's counterclaim.[9]

**REGGIE B. WALTON**
United States District Judge

---

[9]     The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.